2007 OK 40

**CHEROKEE NATION, Plaintiff/Appellee,**

**v.**

Michael **NOMURA,** Co–Director of Heritage Family Services in his **Official Capacity as Administrator of the Oklahoma Interstate Compact on the Placement of Children, Defendant/Appellee,**

and

**American Adoptions of Florida, Inc., Defendant/Appellant.**

No. 102,875.

Supreme Court of Oklahoma.

May 22, 2007.

Michael E. Yeksavich, Tulsa, OK, for Appellant.

Sara E. Hill, Tahlequah, OK, for Plaintiff/Appellee.

Leah Farish, Tulsa, OK, for Defendant/Appellee.

Scott D. Boughton, Oklahoma City, OK, for Oklahoma Attorney General.

## OPINION

WATT, Justice.

¶ 1 This case was previously retained by this Court for disposition. It involves the interaction of the Oklahoma Indian Child Welfare Act (Oklahoma Act) 10 O.S.2001 §§ 40-40.9, the federal Indian Child Welfare Act of 1978 (Federal Act), 25 U.S.C. §§ 1901, et seq., and the Oklahoma Interstate Compact on the Placement of Children (Interstate Compact Act), 10 O.S.2001 §§ 571–576. We consider the right of an Indian mother to place her child voluntarily for adoption with out of state non-Indian adoptive parents without consideration of the placement preferences of the Federal Act, 25 U.S.C. § 1915, or utilizing "to the maximum extent possible" the services of the Indian tribe in placement of the child under 10 O.S. § 40.6 of the Oklahoma Act. The dispositive issue in this adoption proceeding is whether the Oklahoma Act must be applied to every adoption of Indian children born to an Oklahoma Indian parent, even if the Indian parent chooses out of state non-Indian adoptive parents. We hold that it must and affirm the trial court's declaratory judgment.

## PROCEDURAL BACKGROUND

¶ 2 Through an adoption agency, Appellant American Adoptions of Florida, Inc. (Florida Adoption Agency or Agency), the mother chose to have her child adopted by non-Indian parents living in Florida. The child was born in Oklahoma on October 2, 2005. On October 3, 2005, the adoptive parents appeared before the Oklahoma District Court in Rogers County, Oklahoma, with a motion to approve adoption expenses pursuant to 10

O.S.2001 § 7505–3.2(B).[1] The trial court filed an order granting their motion on the same day. On October 11, 2005, the adoptive parents filed a petition for adoption in Florida, and a Florida court issued an order for preliminary custody to the adoptive parents, although neither the birth mother nor the child was present. On October 13, 2005, the mother went to Florida to consent to Florida law for the adoption and the termination of her parental rights. On October 14, 2005, Florida Adoption Agency filed a petition in Florida to terminate the birth parents' parental rights. On October 14, 2005, the Florida court entered a judgment terminating the parental rights to the mother and to "any known and unknown biological father," finding the putative father's right to consent to the adoption had been waived. In that order, the Florida court made a finding that "[a]ll provisions of the Indian Child Welfare Act have been complied with, and all notices required by federal or state law have been given. This is a voluntary proceeding under the ICWA, and therefore, notice to the tribe is not required under ICWA or state law." Also recited in the October 14 order is the following:

> IT IS ORDERED, based upon the request of the natural mother of the minor child, ... that good cause exists to waive, and the court does hereby waive, the adoption placement preferences of the Indian Child Welfare Act, 25 U.S.C. § 1915, to allow the adoptive placement of [the child]

born October 2, 2005, with [adoptive parents].…

¶ 3 The Florida court found that a "voluntary" proceeding under the Federal Act requires neither notice to the Tribe nor adherence to the adoption placement preferences of 25 U.S.C. § 1915 of the Federal Act. "Good cause" to waive the placement preferences was found to exist because the birth mother requested it. It is undisputed that notice to the Tribe was not attempted before October 18, 2005, four days after the Florida court's judgment. **There is also testimony in the record that notice by certified mail from Florida Adoption Agency's attorney Jeanne Tate was not received by the Tribe until November 8, 2005, twenty-five (25) days after judgment was entered.**

¶ 4 After receiving notice of the adoption proceeding in Florida, the Tribe intervened in the Florida case to insure compliance with the Federal Act and to reserve the right to remove it to tribal court. The Tribe then filed this case seeking a temporary restraining order (TRO)[2] against the Administrator of the Oklahoma Interstate Compact on the Placement of Children (Interstate Compact Act), Michael Nomura, Defendant/Appellee (Nomura). The Tribe sought to prevent Nomura from approving the Interstate Compact Act materials and issuing the "100A" in order to prevent removal of the child from Oklahoma.[3]

¶ 5 Florida Adoption Agency specially intervened in the Oklahoma court to challenge

---

1. B. 1. Except as otherwise specifically provided by law, the following list of adoption-related costs and expenses specified in this paragraph may be deemed proper items for a person to pay in connection with an adoption:

   a. reasonable attorney fees and court costs,
   b. reasonable medical expenses for birth mother and minor to be adopted,
   c. reasonable adoption counseling expenses for birth parents before and after the birth of the minor, not to exceed six (6) months from placement of the minor,
   d. reasonable fees of a licensed child-placement agency,
   e. in cases of extraordinary need, reasonable expenses for necessities of the birth mother that are incurred during or as a result of the pregnancy, not to exceed two (2) months from placement of the minor,

   f. reasonable costs for travel or transportation of the birth mother or minor as same is incurred for medical or adoption placement needs,
   g. reasonable expenses for a home study, and
   h. reasonable expenses legally required by any governmental entity related to the adoption of a minor.

2. The first TRO entered by the court was dismissed to allow the Tribe to amend their pleading to add Nomura and Florida Adoption Agency as additional parties.

3. Approval by the Interstate Compact Administrator of the Form "100A" indicates the paperwork from the sending state is complete. Nomura initially gave such approval on a Form "100A", but he later withdrew it because of the lack of compliance with the Federal Act and the Oklahoma Act, after an inquiry by the Florida Administrator regarding notice to the Tribe.

the court's jurisdiction and the alleged interference with the mother's exclusive and constitutionally protected rights in and to her child, as recognized by state and federal courts, and to challenge the requirement to follow the Oklahoma Act in voluntary adoptions.

¶ 6 After dismissal of the first TRO issued, the Oklahoma court issued another TRO and continued the hearing. At the November 8, 2005 hearing which followed, the court dissolved the TRO, finding the Tribe could not show irreparable harm, as the 100A had yet to be issued. Nomura moved to dismiss on grounds of sovereign immunity[4] and alternatively requested a declaratory judgment, pursuant to 12 O.S.2001 § 1652,[5] as to the applicability of 10 O.S.2001 § 40.6[6] to this case. The court denied Nomura's motion to dismiss, stating an order would issue on Nomura's request for declaratory judgment.[7]

¶ 7 As a threshold issue, Nomura moved to dismiss this appeal as to himself on grounds of sovereign immunity because he acts as an agent for the State in a regulatory function for the Interstate Compact and because Florida Adoption Agency failed to give notice to the Attorney General, as required by 12 O.S. Supp.2003 § 1653. The ruling on this motion was deferred by this Court until consideration of the merits of the case. The trial court ruled Nomura, "acting as an agent of the State is barred from suit by sovereign immunity save and except as further set forth herein." The outcome of this litigation will decide the legal issue of whether the Administrator of the Interstate Compact has

a duty to consider the Oklahoma Act as it pertains to and supports the Federal Act. When a party makes an appearance and requests affirmative relief, he has waived any challenge to personal jurisdiction. See *Porter v. Oklahoma Bacone College Trust,* 1959 OK 174, 346 P.2d 335; *Bill Cooper Frac Tank Company v. Columbia Regional Hospital,* 1993 OK CIV APP 54, 856 P.2d 586. The declaratory judgment of the trial court now before us on appeal was rendered at his request. Moreover, this Court issued an order on March 28, 2007, notifying the Attorney General of this appeal, pursuant to 12 O.S. Supp.2003 § 1653 (C), and advising him to file a response brief if he chose to appear. The Attorney General's brief was filed on April 5, 2007, and Appellant's reply brief was filed April 19, 2007. Nomura's motion to dismiss is denied as moot.

## TRIAL COURT'S RULING

¶ 8 In its order, the trial court found:

Thus the ICPC provides that *the child at issue shall be treated in the same manner as such child would have been dealt with had the child remained in the sending state.* Then if OICWA would have been applicable had the child been adopted then it must also be complied with under the provisions of the ICPC. [emphasis in original].

. . .

Under the provisions of 10 O.S. § 40.3, 40.4 and 25 U.S.S. (sic) § 1903 this Court finds that such a proceeding would consti-

---

**4.** Nomura testified that the Oklahoma Department of Human Services (DHS) contracts with Heritage Family Services, Inc., for which he is co-director, to administer the Interstate Compact Act in all adoption-related cases. It functions as part of the executive branch in administering an interstate compact in a regulatory, governmental capacity.

**5.** 12 O.S.2001 § 1652 provides:
A determination of rights, status, or other legal relations may be obtained by means of a pleading seeking that relief alone or as incident to or part of a petition, counterclaim, or other pleading seeking other relief, and, when a party seeks other relief, a court may grant declaratory relief where appropriate.

**6.** 10 O.S.2001 § 40.6 provides in pertinent part:

The placement preferences specified in 25 U.S.C. Section 1915, shall apply to all preadjudicatory placements, as well as preadoptive, adoptive and foster care placements. In all placements of an Indian child by the Oklahoma Department of Human Services (DHS), or by any person or other placement agency, DHS, the person or placement agency shall utilize to the maximum extent possible the services of the Indian tribe of the child in securing placement consistent with the provisions of the Oklahoma Indian Child Welfare Act. . . .

**7.** At the end of the hearing on November 10, 2005, the court also granted Nomura's request for a finding that he was immune from suit on grounds of sovereign immunity.

tute a child custody proceeding as defined by both ICWA and OICWA, regardless of whether the proceeding was determined to be voluntary or involuntary. The Court further finds that the notice requirements of 10 O.S. § 40.4 would apply, and that the placement preference provisions of 25 U.S.C. § 1915 and 10 O.S. § 40.6 would apply to such an adoption proceeding in Oklahoma.

The Court accordingly finds and determines under the facts and circumstances of this case that the Cherokee Nation is entitled to notice of adoption proceedings related to the minor child ... and that the placement preference of 25 U.S.C. § 1915 and 10 O.S. § 40.6 would apply to said child.

It is therefore the Court's determination that Defendant Nomura in his official capacity as administrator of the Oklahoma ICPC does have a duty to see that the placement preference established by OICWA and ICWA are complied with along with the notice provisions therein before approving the adoption placement of [the child] under the provision of the ICPC.

¶ 9 The trial court overruled Florida Adoption Agency's challenge to the court's jurisdiction and rejected its constitutional argument that the mother has a liberty interest to decide who may adopt her child, holding that the parental rights of these parents were terminated at their request. Therefore, the court held that at that point there were no parental rights "except whatever rights the natural parents may retain with

regard to the revocations of their consents...." [8]

¶ 10 The trial court's order concluded:

The Court finds in balancing whatever liberty interest the natural mother may have in making decisions regarding who may adopt the child at issue against the state's compelling interest to recognize and protect the valid governmental interest of Indian Tribes and Nations regarding Indian children, that the statute while intrusive acts to both preserve the integrity of Indian Tribes and people while at the same time addressing the best interest of the Indian child at issue. The Court finds that the governmental interest outweighs whatever parental rights may remain with the natural parents. *See Blevins,* 10 O.S. § 40.1 and 25 U.S.C. § 1915.

## STANDARD OF REVIEW

¶ 11 Under the Declaratory Judgments Act, the determination of a competent court is reviewable in the same manner as other judgments. 12 O.S.2001 § 1654. The trial court's declaratory judgment order addressed an issue of law, and we will review the decision under a *de novo* standard. See *Save Ad Valorem Funding for Students v. Oklahoma Department of Environmental Quality,* 2006 OK CIV APP 53, 135 P.3d 823, *cert. denied,* 2006 (Approved for Publication by Order of the Supreme Court).[9] Thus, we must review the record to determine whether the trial court erred. *City of Chandler v. State ex rel., Department of Human Services,* 1992 OK 137, 839 P.2d 1352.

8. The order provides:
   In the alternative the Court finds that even if the parents do retain some vestige of parental rights and a strict scrutiny standard does apply that the application of 10 O.S. § 40.6 survives the current challenge. The requirements of 10 O.S. § 40.6, while applying to both voluntary and involuntary cases still utilizes the standards of 25 U.S.C. § 1915, including the fact that the good cause exception to the placement provisions still exists.

9. We find this case is a proper case for declaratory relief. The constitutionality of the Oklahoma Act is challenged by Florida Adoption Agency. Nomura seeks declaratory relief to construe the Oklahoma Act which he is required to follow in his position as Interstate Compact Administrator

for Oklahoma. Whether the Oklahoma Act applies will directly impact his actions as Interstate Compact Administrator in **this adoption proceeding** as to whether to approve the Form 100A and forward the case to Florida. This case is thus maintainable as a declaratory judgment action, as it is based on an actual justiciable controversy. See *City of Muskogee v. Martin,* 1990 OK 70, 796 P.2d 337. Also, we have held declaratory relief is appropriate when a statute is attacked on constitutional grounds prior to the time a final judgment is issued, because the law need not be violated before obtaining a declaration of its validity. See *Oklahoma Tax Commission v. Smith,* 1980 OK 74, 610 P.2d 794.

## JURISDICTIONAL ISSUES

■ ¶ 12 The issue of the Oklahoma court's continuing jurisdiction after the initial order approving adoption expenses, under 10 O.S.2001 § 7505–3.2, was raised in the trial court. The trial court held that jurisdiction continued. We agree. Under the Interstate Compact Act, the sending agency "shall continue to have financial responsibility for support and maintenance of the child during the period of the placement." Article V(a). Jurisdiction over the child continues in Oklahoma until the receiving state notifies the "sending agency" [10] in writing that the proposed placement is in the interests of the child. See 10 O.S.2001 § 571, Article III(d).[11] Article V(a) also provides the sending agency shall retain jurisdiction over the child to determine all necessary matters in relation to the child "which it would have had if the child had remained in the sending agency's state, until the child is adopted...."

¶ 13 Florida Adoption Agency appears to acknowledge the authority of the "sending agency" under Article V(a). However, it argues the birth mother, not Administrator Nomura, is designated the "sending agency" on the Form 100A, and that Nomura is required to forward to Florida any information she provided. Agency contends the "receiving state" actually approves whether placement is proper and Nomura has no authority to refuse to sign the 100A and send it to Florida.

■ ¶ 14 We disagree with Agency's contention that Nomura has a duty to "rubber stamp" any information received from the birth mother and forward it to Florida. The Interstate Compact Act allows the proper authorities of the state from which the placement is made to "obtain the most complete information on the basis on which to evaluate a projected placement before it is made." Article I(c). The receiving state may request additional information. Article III(c).[12] In fact, in this case, the Florida Administrator contacted Nomura with concerns about the lack of notice to the Tribe. This led to Nomura's withdrawal of the original Form 100A.[13]

¶ 15 Nomura contends the Interstate Compact Act charges him, as the sending state's Interstate Compact official, with the duty of determining documentation exists showing "maximum opportunity" is taken to find a "suitable environment" for the child, Article I(a). He also contends the Oklahoma Act requires a parent wishing to relinquish his parental rights out of state to utilize the tribe's resources to the "maximum extent possible." See 10 O.S.2001 § 40.6. He stated his signature on the 100A indicates to a receiving state that the evaluation process is complete. At the time of this appeal, that had not been done.

¶ 16 Nomura contends Agency attempts to ignore the clear intent of federal and state law favoring placement with Indian families by designating the birth mother as the "sending agency". Whether it was done to evade the purposes of the Federal Act or

10. See 10 O.S.2001 § 571, Article II(b), The Interstate Compact on the Placement of Children: (b) "Sending agency" means a party state, officer or employee thereof; a subdivision of a party state, or officer or employee thereof; a court of a party state; a person, corporation, association, charitable agency or other entity which sends, brings, or causes to be sent or brought any child to another party state.

11. 10 O.S. § 571, Article III(d) provides: (d) The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

12. (c) Any public officer or agency in a receiving state which is in receipt of a notice pursuant to paragraph (b) of this article may request of the sending agency, or any other appropriate officer or agency of or in the sending agency's state, and shall be entitled to receive therefrom, *such supporting or additional information* as it may deem necessary under the circumstances to carry out the purpose and policy of this compact. [emphasis added].

13. The record shows the withdrawal of the 100A was done promptly after Florida's inquiry. No actions were then taken by either the Oklahoma or the Florida Interstate Compact Administrator to make jurisdiction in Oklahoma questionable. Moreover, this Court has held that retroactive compliance with the Interstate Compact is acceptable. See eg., *White v. Adoption of Baby Boy D.*, 2000 OK 44, 10 P.3d 212.

Oklahoma's jurisdiction is an issue for the trier of fact.

## DISCUSSION

■ ¶ 17 Florida Adoption Agency seeks to challenge the application of the Oklahoma Act to a Florida adoption, the failure to allow Florida law to determine the appropriateness of placement in Florida, and to challenge the failure to acknowledge valid orders of the Florida Court. Also, Agency questions the constitutionality of the Oklahoma Act in voluntary adoptions, claiming it interfered with mother's constitutional and fundamental rights in and to her child, requiring the courts to apply the test of "strict judicial scrutiny" when examining state law. Florida Adoption Agency contends the birth mother selected the Florida family, which is fit and proper to nurture her child, with only the child's best interests in mind. It also contends the Oklahoma Act does not apply unless the Indian child is at risk, or is being endangered by the birth parents and claims that neither the Tribe, nor Nomura, presented any information the child was endangered by the mother or the adoptive family. Agency further contends the only basis for the Tribe's and Nomura's support of the Oklahoma Act is the fact the child is Cherokee, which infringes upon the mother's constitutional rights.

¶ 18 The Attorney General disputes Florida Adoption Agency's contention that this Court is required to apply the standard of "strict judicial scrutiny" to the alleged violation of birth mother's constitutional rights, (i.e., liberty, privacy and the fundamental right to the care and custody of her child). As the Attorney General correctly argues, we held in *In the Matter of Baby Boy L*, 2004 OK 93, 103 P.3d 1099 *(Baby Boy L.)*, discussed *infra*, wherein we cited with approval the case of *In re A.B.*, 2003 ND 98, 663 N.W.2d 625, that the "rational basis" analysis is appropriate when dealing with equal pro-

tection and substantive due process challenges. In holding the Federal and Oklahoma Acts are constitutional as applied to the cause in *Baby Boy L.*, we recognized the U.S. Supreme Court has consistently rejected claims that laws which treat Indians as a distinct class violate equal protection.

¶ 19 In *Baby Boy L.*, we considered a case involving the adoption of an Indian child and the application of the Federal Act and the Oklahoma Act. A child was born out of wedlock to a non-Indian mother and a noncustodial Indian father who did not live on an Indian reservation. The mother wished to place the child for adoption. She sought an order terminating the father's parental rights and declaring the baby eligible for adoption without the consent of the father. She located a non-Indian family in another state who wished to adopt the child. The mother argued the Federal Act and the Oklahoma Act were inapplicable because the baby was not being removed from an Indian family. Thus, she argued, the placement preferences set out in the Federal Act were not mandatory. The trial court agreed with her, and the Court of Civil Appeals affirmed. This Court reversed.

¶ 20 In doing so, we examined *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) *(Holyfield)*, and the application of the Federal Act to the law of individual states. We held the "existing Indian family exception" to the Federal Act was no longer viable in Oklahoma. In so ruling, we noted the *Holyfield* Court recognized Congress showed concern, through passage of the Federal Act, "not only about the interests of Indian children and families, but also about the impact on the tribes because of the large numbers of Indian children being adopted by non-Indians." *Baby Boy L.*, 2004 OK 93, ¶ 14, 103 P.3d 1099, 1104.[14] We determined the Oklahoma Legislature amended the Oklahoma

---

**14.** We noted that the U.S. Supreme Court in *Holyfield* stated, with regard to Congressional intent:

"[I]t is clear that Congress' concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture. Congress determined to subject such placements to the ICWA's jurisdictional and other provisions, *even in cases where parents consented to an adoption,* because of concerns going *beyond the wishes of individual parents ....*" [emphasis added].

Act in 1994 to abrogate the judicially created "existing Indian family exception" to the Federal Act in Oklahoma. We determined the Legislature so acted, partly "in recognition of the *Holyfield* teaching." *Baby Boy L.*, 2004 OK 93, ¶ 16, 103 P.3d 1099, 1106. We recognized the Federal Act showed Congressional intent to achieve uniformity among the states where the interests of Indian children, parents and tribes are concerned. We find the 1994 amendments of the Oklahoma Act show the Oklahoma Legislature's intent to make clear a parent involved in a voluntary "child custody proceeding" involving an Oklahoma Indian child may not ignore the application of the Federal Act as a matter of personal choice.[15] See 10 O.S.2001 §§ 40.3 (B) and (E):

> B. Except as provided for in subsection A of this section [involving divorce and delinquency], the Oklahoma Indian Child Welfare Act applies to all state *voluntary and involuntary* child custody court proceedings involving Indian children, *regardless of whether or not the children involved are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated.* [emphasis added].
>
> . . .
>
> E. The determination of the Indian status of a child shall be made as soon as practicable in order to ensure compliance with the notice requirements of Section 40.4 of this title.

Also amended in 1994 is section 40.4 [16] which provides:

> In all Indian child custody proceedings of the Oklahoma Indian Child Welfare Act, *including voluntary court proceedings and review hearings,* the court shall ensure that the district attorney or other person initiating the proceeding shall send notice to the parents or to the Indian custodians, if any, *and to the tribe that is or may be the tribe of the Indian child,* and to the appropriate Bureau of Indian

Affairs area office, by certified mail return receipt requested. The notice shall be written in clear and understandable language .... [emphasis added].

¶ 21 In *Holyfield,* the sole issue before the United States Supreme Court was the domicile of Indian twins whose voluntary adoption was under consideration. Their parents had lived on the reservation until immediately before their birth when they moved to Mississippi. If domiciled on the reservation, the tribal court had jurisdiction. See 25 U.S.C. § 1911(a). The parents argued the domicile of the twins was in Mississippi and the adoption should proceed in state court. The Supreme Court decided "domicile" under § 1911(a) must be given the construction which provides uniformity under federal law for purposes of the Federal Act. **The Court held the result should not be different "simply because the twins were 'voluntarily surrendered' by their mother ... [because] [t]ribal jurisdiction ... was not meant to be defeated by the actions of individual members of the tribe....** " *Holyfield,* 490 U.S. 30, 49, 109 S.Ct. 1597, 1608. [emphasis added].

¶ 22 In the instant case, we do not have before us the domicile issue because neither the mother nor the child lived on a reservation. When "child custody proceedings" under the Federal Act take place in state court, certain statutory preferences are mandated under 25 U.S.C. § 1915(A), "absent good cause to the contrary." The *Holyfield* Court stated, at 1602:

> The most important substantive requirement imposed on state courts is that of § 1915(a), which absent "good cause" to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families.

¶ 23 Agency contends the Oklahoma Act's requirement of notice to the Tribe in "volun-

---

15. See, 10 O.S.2001 § 40.6 (note 7, supra), which provides that all adoption placements in Oklahoma shall utilize the placement preferences of 25 U.S.C. § 1915, as well as the services of the Tribe "to the maximum extent possible."

16. Except for a change from "registered mail" to "certified mail", the current statute, 10 O.S. Supp.2006 § 40.4, contains the same language noted above. Our references to § 40.4 will be to the current statute unless otherwise noted.

tary" adoptions is unconstitutional because in the Federal Act, under 25 U.S.C. § 1912(a), notice is only required for involuntary state court proceedings. But see 25 U.S.C. § 1913(c) which provides, "In any *voluntary* proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption ...." [emphasis added]. Clearly, the Federal Act contemplates voluntary proceedings. See also 25 U.S.C. § 1911(c), which provides "In *any* State court proceeding for ... termination of parental rights to, an Indian child, ... the Indian child's tribe shall have a right to intervene at any point in the proceeding." [emphasis added]. It would be difficult indeed to enforce the right to intervene in the proceeding without receiving notice of it.

■ ¶ 24 Agency contends *Holyfield* is inapplicable to this case because of its distinguishing factual scenario. However, we adhered to its teachings in *Baby Boy L.*, despite somewhat different facts, and we recognized *Holyfield's* influence on our Legislature's amendments to the Oklahoma Act. Congress intended the protections of the Federal Act to extend not only to Indian children and families, but also to the tribes themselves. Although notice to the tribe was not the main issue, the Supreme Court recognized Congress intended the Federal Act to promote uniformity and the protec-

tion of individual Indians *and* the Tribes. This persuades us that compliance with the Federal Act is required in voluntary and involuntary "child custody proceedings." Indeed, the "child custody proceeding" [17] in *Holyfield* was a *voluntary* adoption and termination of parental rights case.

¶ 25 Further, the Oklahoma Act does not restrict the Federal Act, but in fact, supports it in state court adoptions. Neither the purpose of the Federal Act nor the Oklahoma Act can be achieved without notice to the tribe or consideration of the placement preferences. We noted in *Baby Boy L.*, supra, that the amendments to the Oklahoma Act showed our Legislature was aware of *Holyfield* and attempted to conform our laws consistently with the Federal Act. See 25 U.S.C. § 1921, which recognizes:

> In any case where State or Federal law applicable to a child custody proceeding under State or Federal law provides a *higher standard of protection* to the rights of the *parent or Indian custodian of an Indian child* than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard. [emphasis added].

■ ¶ 26 Since *Holyfield* instructs that the Federal Act was intended to protect the Indian child, the parents *and the Tribe*, we find the "higher standard of protection" under § 1921 extends to the Tribe as well.[18] While domicile of mother and child is not an issue in this case, *Holyfield* instructs that a

---

**17.** "Child custody proceeding" is defined by the Federal Act, 25 U.S.C. § 1903(1) and includes "adoptive placement" defined as "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." 25 U.S.C. § 1903(1)(iv). Under 10 O.S.2001 § 40.3, the Oklahoma Act, "in accordance with the federal Indian Child Welfare Act, applies to all child custody proceedings involving any Indian child" except divorce and delinquency proceedings. It also provides, at § 40.3(B), that the Oklahoma Act "applies to all state voluntary and involuntary child custody court proceedings involving Indian children, regardless of whether or not the children involved are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated."

**18.** This intended protection was recognized by our Legislature in 1994 when it abrogated the

"existing Indian Family exception" in its amendment of 10 O.S.1991 § 40.1 (currently cited as 10 O.S.2001 § 40.1 ), by adding the following italicized language to that section:

The purpose of the Oklahoma Indian Welfare Act is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the federal Indian Child Welfare Act, P.L. 95–608. *It shall be the policy of the state to recognize that Indian tribes and nations have a valid governmental interest in Indian children regardless of whether or not said children are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated.* It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced. [emphasis added].

change in domicile *merely for the purpose of avoiding the Federal Act* was an invalid act. Crossing state lines to avoid the jurisdiction of the tribal courts was held to be ineffective for purposes of the Federal Act.

## CONCLUSION

¶ 27 We hold that the Oklahoma Act does not conflict with the Federal Act in its requirements of notice to the Tribe under 10 O.S. Supp.2006 § 40.4[19] when *voluntary or involuntary* child custody proceedings are initiated; or under 10 O.S.2001 § 40.6, which provides the placement preferences in 25 U.S.C. § 1915 shall apply to all adoptive placements of Indian children. Section 40.6 adds the further requirement that the placement agency "shall utilize to the maximum extent possible the services of the Indian tribe of the child in securing placement consistent with the provisions of the Oklahoma Indian Child Welfare Act." The Oklahoma Act supports the Federal Act by recognizing the Tribe's interests must be protected in adoption proceedings involving Indian children. The Oklahoma Act is thus consistent with the Federal Act and its purposes as recognized by the United States Supreme Court.

¶ 28 The trial court's declaratory judgment correctly states that the Federal Act and the Oklahoma Act apply to the adoption proceeding, that the Tribe is entitled to notice, and that the placement preferences under 25 U.S.C. § 1915 and 10 O.S. § 40.6 apply to voluntary and involuntary child custody proceedings. The court also properly declared Nomura, in his official capacity as Administrator of the Interstate Compact Act, has a duty to see that there is compliance with the placement preferences of the Okla-

homa and Federal Acts prior to approving the adoption under the Interstate Compact Act.

¶ 29 While we agree it must be followed, it is not necessary in this case to define the language "to the maximum extent possible," found in 10 O.S. § 40.6, in reference to utilization of the Tribe's services in adoptions of Indian children. Under the circumstances of this case, no attempt whatsoever was made to involve the Tribe in the placement of the child. Agency's allegations that the Tribe was given notice and intervened in Florida are hollow attempts to justify the actions taken after the judgment was entered.

¶ 30 The withdrawal of the Form 100A by Nomura effectively prevented jurisdiction from being lost in Oklahoma. We offer no opinion on the effectiveness or validity of the Florida judgment. We only provide declaratory relief herein to clarify Oklahoma law in connection with the requirements of the Federal Act and the Interstate Compact Act. We hold that adoptions of Oklahoma Indian children require notice to the Tribe and compliance with the Oklahoma Act, whether the child custody proceedings are voluntary or involuntary. The Administrator has a duty to question whether compliance has been made before signing the Form 100A which facilitates sending the adoption to another state to complete. This case is affirmed.[20]

¶ 31 **AFFIRMED.**

EDMONDSON, V.C.J., LAVENDER, OPALA, KAUGER, WATT, COLBERT, JJ., concur.

---

19. The current statute is substantially similar to the statute in effect at the time this proceeding was initiated. The amendment in 2006 changed the requirement of "registered" mail to "certified" mail in the first paragraph.

20. We express no opinion on the ultimate placement of the child. Nevertheless, we note that placement preferences for Indian children are subject to a "good cause" exception. See, 10 O.S.2001 § 40.6 and 25 U.S.C. § 1915. Furthermore, at least one court has determined that the parent's preference for placement with a non-Indian family may be sufficient to invoke the

"good cause" exception. *In re Adoption of B.G.J.*, 33 Kan.App.2d 894, 111 P.3d 651, 657–58 (2005), *judgment affirmed, In re Adoption of B.G.J.*, 281 Kan. 552, 133 P.3d 1 (2006). Finally, in non-Indian placement proceedings, the Legislature has deemed the amount of time in which the child has been in the prospective adoptive home significant. See, 10 O.S. § 7003–5.6h(B), which recognizes that long placement of a child may justify great weight being given to this factor in determining a child's best interests in adoption proceedings.

TAYLOR, J., concurs in result.

WINCHESTER, C.J., HARGRAVE, J., dissent.